In re The ELDER–BEERMAN STORES CORP., an Ohio Corporation, et al., Debtors.

The ELDER–BEERMAN STORES CORP., Plaintiff,

v.

THOMASVILLE FURNITURE INDUS. INC., Defendant.

Bankruptcy No. 95–33643.
Adversary No. 96–3047.

United States Bankruptcy Court,
S.D. Ohio,
Western Division.

Feb. 12, 1997.

Lawrence E. Oscar, Hahn Loeser & Parks, Cleveland, Ohio.

William B. Sullivan, Womble Carlyle Sandridge & Rice, Winston–Salem, NC.

Richard A. Chesley, Jones, Day, Reavis & Pogue, Columbus, Ohio.

Randy T. Slovin, Mason Slovin & Schilling Co., LPA, Cincinnati, Ohio.

## DECISION AWARDING LOST PROFIT DAMAGES FOR BREACH OF CONTRACT AND VIOLATION OF AUTOMATIC STAY

WILLIAM A. CLARK, Chief Judge.

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) & 1334, and the standing General Order of Reference in this District. This proceeding constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) & (O) (1994).

### PROCEDURAL POSTURE

This case originally came before the court by way of the filing of the Verified Complaint for Injunctive Relief by Plaintiff The Elder–Beerman Stores Corp., Inc., et al. (hereinafter Elder–Beerman or Plaintiff) on March 14, 1996. Since that time the court has had numerous hearings and has considered a multitude of pleadings. After a determination by this court that Defendant Thomasville Furniture Industries, Inc. (hereinafter Thomasville or Defendant) was not entitled to relief from the automatic stay, see In re Elder–Beerman Stores Corp., 195 B.R. 1012 (Bankr.S.D.Ohio 1996), and that Defendant has committed acts in violation of the automatic stay, see Elder–Beerman Stores Corp. v. Thomasville Furniture Indus., Inc. (In re Elder–Beerman Stores Corp.), 195 B.R. 1019 (Bankr.S.D.Ohio 1996), the parties and the court turned their attention to the matter of what damages, if any, may be awarded for

such violations. As the result of a subsequent hearing, the court rejected the Plaintiff's request for damages under 11 U.S.C. § 362(h) (1994), *see Elder–Beerman Stores Corp. v. Thomasville Furniture Indus., Inc. (In re Elder–Beerman Stores Corp.)*, 197 B.R. 629 (Bankr.S.D.Ohio 1996), but reserved for a later hearing the issue of what damages, if any, might arise under 11 U.S.C. § 105(a) (1994) or under state contract law.

Prior to the final hearing on this matter on October 24 and 25, 1996, the parties engaged in extensive settlement negotiations conducted by senior bankruptcy judge the Honorable Burton Perlman. As a result of those negotiations, the court entered an Agreed Order on September 26, 1996 which considerably focussed the issues before the court. *See Agreed Order*, Adv. Doc. # 81–1. In addition, the Final Pretrial Conference Order specified that the law of the State of Ohio would govern any breach of contract cause of action litigated by the parties. *Final Pretrial Conference Order*, Adv. Doc. # 86–1, at ¶ 1.

On October 24 and 25, 1996, the court conducted the final hearing on this matter. At the close of that hearing, the court took the remaining issues under advisement for subsequent decision. The court is now prepared to render its decision in this matter.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

After having considered the multitude of pleadings, depositions, testimony, and exhibits submitted by the parties for the October 24 and 25, 1996 and previous hearings, the court recognizes that several unresolved issues remain for the court's determination. First, it is necessary to address what effect, if any, the court's previous findings of fact have on the issues raised in the October 24 and 25 hearings. Second, the court will consider that admissibility of testimony from Plaintiff's expert witness, Mr. Julian Taub. Third, the court will address its power to award damages under both 11 U.S.C. § 105(a) and state contract law. Next, the court must determine whether the Plaintiff has sustained its burden of proof as to causa-

tion of any alleged damages. If the court finds that the Plaintiff has sustained its burden, it then becomes necessary for the court to address the three independent claims for damages by the Plaintiff, that of lost profits from lost Thomasville sales, from lost ancillary sales, and from lost credit transactions. In examining those claims, the court must address the expert testimony of both the Plaintiff's and the Defendant's witnesses, as well as the court's role in reaching independent conclusions as to damages. In addressing the issue of lost credit transactions, the court will consider an issue raised in the October 24 and 25 hearings, the effect of the language in the Agreed Order addressing damages arising from credit sales. Finally, the court will determine what attorneys' fees, if any, are appropriate under the Agreed Order.

### THE LEGAL EFFECT OF PREVIOUS FINDINGS OF FACT

■ As an initial matter, the court wishes to address what effect, if any, the court's earlier findings of fact have on Elder–Beerman's burden to establish causation. In both its May 1, 1996 and May 2, 1996 Orders, this court issued extensive findings of fact. *See In re Elder–Beerman Stores Corp.*, 195 B.R. 1012 (Bankr.S.D.Ohio 1996); *Elder–Beerman Stores Corp. v. Thomasville Furniture Indus., Inc. (In re Elder–Beerman Stores Corp.)*, 195 B.R. 1019 (Bankr.S.D.Ohio 1996).

It is clear that there exists a disagreement between the parties as to the effect of those previous findings of fact. In the October 24 and 25, 1996 hearing on damages, counsel for Elder–Beerman relied heavily on this court's previous findings of fact in attempting to meet its burden of proof to establish causation. In response, counsel for Thomasville has relied on the general rule that findings of fact in preliminary injunction proceedings are for the sole purpose of ascertaining what nature of injunctive relief was necessary or appropriate. *See, e.g., Unsecured Creditors' Comm. of DeLorean Motor Co. v. DeLorean (In re DeLorean Motor Co.)*, 755 F.2d 1223, 1228 (6th Cir.1985). The Sixth Circuit, in *United States v. Owens*, reiterated the standard set forth by the Supreme Court as to

factual findings in preliminary injunction hearings:

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party is thus not required to prove his case in full at a preliminary injunction hearing, and *the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.* In light of these considerations, it is generally inappropriate for a federal court at the preliminary injunction stage to give a final judgment on the merits.

*United States v. Owens,* 54 F.3d 271, 276 (6th Cir.), *cert. dismissed sub nom., Spirko v. United States,* —— U.S. ——, 116 S.Ct. 492, 133 L.Ed.2d 418 (1995) (emphasis added) (citing *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981)).

While this court recognizes this general rule regarding findings of fact in preliminary injunction hearings, the court also recognizes that automatic stay proceedings, though similar to preliminary injunction hearings in their equitable nature, are not governed by the same considerations. For example, § 362 of the Bankruptcy Code allocates the burdens of proof to be applied in relief from stay actions:

> In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section—(1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and (2) the party opposing such relief has the burden of proof on all other issues.

11 U.S.C. § 362(g) (1994). In preliminary injunction hearings, on the other hand, the burden of proof falls squarely on the party seeking the protection of the court. *See Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda County,* 415 U.S. 423, 441, 94 S.Ct. 1113, 1125, 39 L.Ed.2d 435 (1974).

In addition, it is clear that the concerns expressed by the Supreme Court in *Camenisch* do not exist as such in the case of automatic stay litigation. An automatic stay hearing is not one to preserve the status quo, but to alter it. *See, e.g., University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981). Also, while automatic stay litigation is often less formal then other litigation, it is generally not conducted with the same degree of haste noted by the Supreme Court in *Camenisch. Id.*

Thus while automatic stay issues may be similar to preliminary injunction ones, the same rules do not always apply to both. Instead, it is the court's opinion that when, as in the instant case, an automatic stay proceeding is spread out over several hearings, the competing doctrine of "the law of the case" applies. *See First Nat'l Bank of Boston v. Kors, Inc. (In re Kors, Inc.),* 15 B.R. 444, 446 (Bankr.D.Vt.1981). As Judge Stevenson of the Western District of Michigan Bankruptcy court has found:

> Under Rule 56(a), (d), and Rule 42(b), the district court exercises a broad authority to dispose of cases in stages. These decisions are interlocutory in character and until entry of judgment, they remain subject to change at any time. The doctrine of law of the case does not limit the power of the court in this respect. Yet the very purpose of deciding some issues ahead of others is to aid in the logical and orderly disposition of the whole. It would be utterly destructive of this end if each successive decision resulted in the reconsideration of every previous one, and the sequence of decisions in the same case is based on different views of overlapping issues of law would likely result in an internally inconsistent judgment. To avoid this dilemma, it is the practice to treat each successive decision as establishing the law of the case and to depart from it only for convincing reasons.

*Grand Traverse Dev. Co. Ltd. Partnership v. Board of Trustees (In re Grand Traverse Development Co. Ltd. Partnership),* 150 B.R.

176, 184 (Bankr.W.D.Mich.1993) (quoting 3 J. MOORE, MOORE'S MANUAL § 30.03[2] ).

■ It therefore seems clear that the findings of fact in a relief from stay proceeding need not be relitigated in a subsequent hearing to determine damages from such violation. *See, e.g., In re Kors,* 15 B.R. at 446 ("It seems apparent that a finding of fact in a prior adverse proceeding involving the same parties or a successor in interest such as a trustee in bankruptcy need not be relitigated."); *see also Harrington v. Vandalia– Butler Bd. of Educ.,* 649 F.2d 434, 441 (6th Cir.1981) ("[I]t is clear that a court may take judicial notice of its own record of another case between the same parties.") (citing *Shuttlesworth v. Birmingham,* 394 U.S. 147, 157 n. 6, 89 S.Ct. 935, 942 n. 6, 22 L.Ed.2d 162 (1969)); *Aloe Creme Laboratories, Inc. v. Francine Co.,* 425 F.2d 1295, 1296 (5th Cir. 1970) ("The District Court clearly had the right to take notice of its own files and records and it had no duty to grind the same corn a second time. Once was sufficient.").

■ This is not to say that the Defendant may not attack those previous findings or that the court may not adjust the previous findings to more accurately reflect all the facts before the court. "[T]he doctrine of the law of the case 'is a rule of practice rather than a command of the courts.' The doctrine cannot prohibit a judge from reforming his own opinion before it is final." *Farmers & Merchants Bank & Trust of Watertown v. Trail West, Inc.,* 28 B.R. 389, 393 (D.S.D. 1983) (citations omitted). The doctrine is followed absent a compelling reason not to do so. *Grand Traverse,* 150 B.R. at 184.

This court will therefore adopt its findings of fact from both the May 1, 1996 and May 2, 1996 Orders to the extent that those findings are unchanged by this opinion. *See In re Elder–Beerman Stores Corp.,* 195 B.R. 1012 (Bankr.S.D.Ohio 1996); *Elder–Beerman Stores Corp. v. Thomasville Furniture Indus., Inc. (In re Elder–Beerman Stores Corp.),* 195 B.R. 1019 (Bankr.S.D.Ohio 1996). To the extent that the findings in this opinion differ from the earlier findings, however, this opinion should be considered controlling.

■ Thus Plaintiff is not required to relitigate the issue of causation of damages to the extent that that causation may be established by the same facts which established the previously determined violation of the automatic stay. To the extent that additional facts are required to establish causation, however, or that Defendant can show that previous factual determinations are in error, Plaintiff may not rely solely on this court's previously determined findings of fact, but must supplement the facts already in evidence to establish its burden of proof.

## THE ADMISSIBILITY OF PLAINTIFF'S EXPERT TESTIMONY

■ It is important to note here that while counsel for Thomasville objected in both pleadings and at trial to Mr. Taub's testimony, the court found Mr. Taub's testimony to be admissible expert testimony under Federal Rule of Evidence 702. The standard for legal admissibility of expert testimony under Rule 702 was considered by the Supreme Court in *Daubert v. Merrell–Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). While the Supreme Court in *Daubert* limited its consideration to scientific expert testimony, *see Daubert,* 509 U.S. at 590 n. 8, 113 S.Ct. at 2795 n. 8, the Sixth Circuit has determined that a similar duty exists for other types of expert testimony. *See Cook v. American S.S. Co.,* 53 F.3d 733, 738 (6th Cir.1995). Statistical evidence is included within this consideration. *State of Ohio ex rel. Montgomery v. Louis Trauth Dairy, Inc.,* 925 F.Supp. 1247, 1252 (S.D.Ohio 1996).

■ Although, for the reasons more clearly stated below, this court rejects some of Mr. Taub's conclusions, this is for reasons more clearly viewed as evidentiary weight and not admissibility. *See, e.g., Berry v. City of Detroit,* 25 F.3d 1342, 1351–53 & n. 11 (6th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 902, 130 L.Ed.2d 786 (1995). Issues such as selection of data for analysis and the appropriateness of the expert's conclusions are not relevant to the Daubert consideration. *Daubert,* 509 U.S. at 595, 113 S.Ct. at 2797–98; *Berry,* 25 F.3d at 1352 n. 11. Mr. Taub based his lost profit forecasting on

generally acceptable statistical methods which the court has found to be useful in its analysis. *See Falls Steel Tube & Mfg. Co. v. Trumark, Inc.*, 73 F.3d 361, 1995 WL 750541, at *3 (6th Cir. Dec. 18, 1995) (unpublished disposition) (accepting expert's use of "trend" in forecasting lost profits, but also validating jury's choice in rejecting that forecast); *see also Bach v. Penn Central Transp. Co.*, 502 F.2d 1117, 1121 (6th Cir.1974) (admitting evidence of inflationary trends in damages awards); *Lanning v. Matlack, Inc.*, 1981 WL 4531, at *14 (Ohio Ct.App. Oct. 1, 1981) (unpublished disposition) (same). The court therefore reaffirms its ruling that Mr. Taub's testimony is admissible under both *Daubert* and Rule 702.

■ In addition, Thomasville strenuously objected to the breadth of Mr. Taub's testimony, claiming that it was beyond the scope of agreed to testimony given that parties did not receive expert reports in compliance with Federal Rule of Civil Procedure. *See* FED.R.CIV.P. 26(a)(2)(B). The decision of whether or not to sanction parties for failure to comply with Rule 26(a) is within the discretion of the trial court. *See Patel v. Gayes*, 984 F.2d 214, 220 (7th Cir.1993) ("Under the Federal Rules, the district court has the discretion to impose sanctions on a party if that party fails to meet the requirements of Rule 26."); *see also Bentley v. Clisso*, 89 F.3d 832, 1996 WL 306525, at *3 (6th Cir. June 6, 1996) (unpublished disposition). The court is of the opinion that the failure of Elder–Beerman to disclose an expert report was harmless. *See* Fed.R.Civ.P. 37(c)(1). Both parties were subject to the same expedited schedule that made disclosure impractical. Thomasville has adequate notice of the content of Mr. Taub's testimony, extensively deposed Mr. Taub prior to trial, and there was no evidence presented at trial of any surprise in Mr. Taub's disclosures. Even the last minute changes made in Mr. Taub's testimony were to Thomasville's benefit. As such, the court finds the consideration of Mr. Taub's expert testimony properly within its discretion.

## THE COURT'S POWER TO AWARD DAMAGES

■ Though, as has been previously determined in this matter, this court cannot award damages to corporations for automatic stay violations under 11 U.S.C. § 362(h), *Elder–Beerman Stores Corp. v. Thomasville Furniture Indus., Inc. (In re Elder–Beerman Stores Corp.)*, 197 B.R. 629, 632 (Bankr. S.D.Ohio 1996), this court has established that it may properly award damages under an alternative theory. *Id.* at 632–34.

■ As this court considered when deciding the issue of § 362(h) damages, bankruptcy courts have the power under § 105(a) to award civil contempt damages for automatic stay violations. *Id.* at 632; *see also Mountain Am. Credit Union v. Skinner (In re Skinner)*, 917 F.2d 444, 447 (10th Cir.1990) ("[T]he weight of authority supports our holding that section 105(a) empowers bankruptcy courts to enter civil contempt orders."). Civil contempt damages may be properly awarded to persons or corporations not protected by § 362(h). *See In re Elder–Beerman*, 197 B.R. at 633; *see also Havelock v. Taxel (In re Pace)*, 67 F.3d 187, 193 (9th Cir.1995) ("It is clear that, even though a trustee does not qualify as an 'individual' for purposes of section 362(h), a trustee can recover damages in the form of costs and attorney's fees under section 105(a) as a sanction for ordinary civil contempt."). "Civil contempt may be used either 'to coerce future compliance with a court's order, or to compensate for the injuries resulting from the noncompliance.' " *In re Elder–Beerman*, 197 B.R. at 633 (quoting *Ahmed v. Reiss Steamship Co. (In re Jaques)*, 761 F.2d 302, 305–06 (6th Cir.), *cert. denied*, 475 U.S. 1044, 106 S.Ct. 1259, 89 L.Ed.2d 570 (1985)).

■ In order for the court to award damages under § 105, it is necessary only for the court to find that the ordinary standards of civil contempt have been met. *Id.; see also N.L.R.B. v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 591 (6th Cir.1987) (citing *SEC v. First Fin. Group of Texas, Inc.*, 659 F.2d 660, 669 (5th Cir.1981)). " 'As a result, the showing required for civil contempt sanctions in connection with a violation of the automatic stay is less stringent than the showing required for sanctions under section 362(h).' " *In re Elder–Beerman*, 197 B.R. at 633 (quot-

ing *Utah State Credit Union v. Skinner* (*In re Skinner*), 90 B.R. 470, 479 (D. Utah 1988), *aff'd sub nom.*, *Mountain Am. Credit Union v. Skinner* (*In re Skinner*), 917 F.2d 444 (10th Cir.1990)).

In the Sixth Circuit, "[a] litigant may be held in contempt if his adversary shows by clear and convincing evidence that 'he violate[d] a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order.'" *Cincinnati Bronze, Inc.*, 829 F.2d at 591 (quoting *First Fin. Group of Texas, Inc.*, 659 F.2d at 669). The automatic stay is just such a definite and specific order of the court. *In re Elder–Beerman*, 197 B.R. at 633; *see Alder v. Hailey* (*In re Hailey*), 621 F.2d 169, 172 (5th Cir.1980) (civil contempt is appropriate when the automatic stay has been violated by a party having actual knowledge of the automatic stay); *Wagner v. Ivory* (*In re Wagner*), 74 B.R. 898, 904 (Bankr.E.D.Pa. 1987) (Foxx, J.) ("knowledge of the bankruptcy filing is the legal equivalent of knowledge of the stay.") (Judge Foxx's opinion is widely cited by courts of all levels for this proposition); *see also In re Winters*, 1995 WL 453053, at *6 (N.D.Ill. July 28, 1995); *University Med. Ctr. v. Sullivan*, 125 B.R. 121, 128 (E.D.Pa.1991); *Ramirez v. Fuselier* (*In re Ramirez*), 183 B.R. 583, 589 (9th Cir. BAP 1995). *Compare Cincinnati Bronze, Inc.*, 829 F.2d at 591 ("definite and specific order") *with Thacker v. Etter* (*In re Thacker*), 24 B.R. 835, 838 (Bankr.S.D.Ohio) (Newsome, J.) ("The stay imposed under § 362 is comparable to an automatic injunction.").

Thus the Plaintiff, in a suit to recover civil contempt damages for an automatic stay violation, need only establish that the Defendant had actual knowledge of the commencement of bankruptcy proceedings, which equates to imputed knowledge of the automatic stay's presence and effect. It is unnecessary for the Plaintiff to establish elements of § 362(h) damages such as wilfulness on the part of the Defendant. *In re Elder–Beerman*, 197 B.R. at 632–33; *see also McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949) ("The absence of wilfulness does not relieve from civil contempt."); *In re Bennett*, 135 B.R. 72, 78 (Bankr.S.D.Ohio 1992) (Cole, J.) ("The Court determines that, even if wilfulness on the part of the Huntington had not been found, § 105(a) would permit and justify it to award actual damages and attorneys' fees.").

This court has already determined that Thomasville had actual knowledge of the bankruptcy proceedings, and was in fact motivated by that knowledge in performing the acts which constitute stay violations. *In re Elder–Beerman*, 197 B.R. at 633.

It is therefore clear that this court has the power to award the Plaintiff in this matter damages for the acts in question. The award of civil contempt damages is discretionary. *Id.* at 634; *see also, United States v. Arkison* (*In re Cascade Roads, Inc.*), 34 F.3d 756, 767 (9th Cir.1994); *In re Xavier's of Beville, Inc.*, 172 B.R. 667, 671–72 (Bankr.M.D.Fla.1994). Such damages are limited to actual damages and attorney's fees, and may not include punitive damages. *In re Elder–Beerman*, 197 B.R. at 634; *see also United States v. United Mine Workers*, 330 U.S. 258, 304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947); *Reed v. Rhodes*, 635 F.2d 556, 558 (6th Cir.1980); *Thacker*, 24 B.R. at 838 n. 1.

Because, as noted above, civil contempt orders ordinarily do not permit an award for punitive damages, the court directed the parties to consider the issue of what actual damages and attorneys fees might be appropriate. *In re Elder–Beerman*, 197 B.R. at 634. The purpose of the October 24 and 25, 1996 hearing was to determine what actual damages, if any, Elder–Beerman had incurred as a result of Thomasville's actions in the Fall of 1995 and the Spring of 1996. Prior to this hearing, the parties had agreed to limit their damages to "those damages, if any, caused by Thomasville's violation of the automatic stay as found by the Court in its Decision and Order" and "damages, if any, for the time period from October 17, 1995, to July 31, 1996, caused by the Assumed Breaches." *Agreed Order*, Adv. Doc. # 81–1, at ¶ 3. The Agreed Order limited Elder–Beerman's Damages Claims "to lost profits

from the losses of Thomasville furniture sales, non-Thomasville furniture sales, ancillary sales, and credit card carrying charges." *Id.*

■ In order for Elder–Beerman to prevail on its damages claims, it must prove both causation and damages under the law of Ohio. *Agreed Order,* Adv. Doc. # 81–1, at ¶ 2; *Final Pretrial Conference Order,* Adv. Doc. # 86–1, at ¶ 1. It is important to note, however, that the parties are not seeking damages under Ohio law, but under 11 U.S.C. § 105(a). In its previous decision, this court conditioned the aforementioned civil contempt damages on a showing of actual damages. *In re Elder–Beerman,* 197 B.R. at 634. It is uncertain whether Plaintiff would actually be entitled to state law contract damages, given that the contract was terminable at will. In Ohio there is no duty of good faith applicable in exercising a terminable at will clause. *Bill Call Ford, Inc. v. Ford Motor Co.,* 48 F.3d 201, 206 (6th Cir. 1995) (interpreting Ohio law); *Belfance v. Standard Oil,* 1990 WL 203173, at *3–4 (Ohio Ct.App. Dec. 12, 1990).

Thus it is not state law but rather the interaction of §§ 362 and 365(e)(1) that prevented the contract in question from being terminated. *See Elder–Beerman Stores Corp. v. Thomasville Furniture Indus., Inc. (In re Elder–Beerman Stores Corp.),* 195 B.R. 1019, 1024 (Bankr.S.D.Ohio 1996); *see also Computer Communications, Inc. v. Codex Corp. (In re Computer Communications, Inc.),* 824 F.2d 725, 729 (9th Cir.1987) (holding that even an unassumable executory contract would be protected from termination by the automatic stay). It is accordingly, § 105(a) which ultimately dictates the burdens for a plaintiff to recover civil contempt damages under these circumstances.

Elder–Beerman need not, therefore, establish every element of a state contract law damages claim in order to recover. Elder–Beerman need only establish causation and damages as per the Agreed Order dated September 26, 1996. *See Agreed Order,* Adv. Doc. # 81–1, at ¶ 2.

With this in mind, the court will examine in turn each of Elder–Beerman's claims for lost profits (lost Thomasville sales, lost ancillary sales, and lost credit income) for causation and damages.

### LOST THOMASVILLE SALES

■ In order to prove lost profit damages in Ohio, it is necessary for the Plaintiff to demonstrate that the "profits were within the contemplation of the parties at the time the contract was made, the loss of profits is the probable result of the breach of contract, and the profits are not remote and speculative and may be shown with reasonable certainty." *Charles R. Combs Trucking, Inc. v. International Harvester Co.,* 12 Ohio St.3d 241, 466 N.E.2d 883, 887 (1984); *see also Anchor v. O'Toole,* 94 F.3d 1014, 1020–21 (6th Cir.1996); *Battista v. Lebanon Trotting Ass'n,* 538 F.2d 111, 119 (6th Cir.1976) (both cases deferring to Ohio lost profits analyses in diversity cases).

■ That profits were within the contemplation of the parties at the time that contract was made is clear. For example, testimony at previous hearings demonstrated that

on August 1, 1994, Michael Nesbit, Thomasville's representative to Elder–Beerman, wrote a memo to Bill Carrico, his supervisor, concerning the November grand opening of Elder–Beerman's fourth Thomasville Gallery at its Fairborn location. Because Thomasville was Elder–Beerman's "number one vendor and growing," Mr. Nesbit recommended that Thomasville offer Elder–Beerman support in the form of $22,500 of products discounts and cooperative advertising funds. As justification for this expenditure, Mr. Nesbit indicated his confidence that the Elder–Beerman relationship would continue to be *profitable* for Thomasville.

*Elder–Beerman Stores Corp. v. Thomasville Furniture Indus., Inc. (In re Elder–Beerman Stores Corp.),* 195 B.R. 1019, 1021 (Bankr.S.D.Ohio 1996) (emphasis added).

In addition, Elder–Beerman's making significant expenditures to its galleries to conform with Thomasville requirements and eliminating its relationship with other furniture manufacturers to make room for Thomasville products demonstrate that profits were within its consideration. *Id.* at 1020–

21. Elder–Beerman was even considering doubling the number of its Thomasville galleries prior to the bankruptcy. *Id.* at 1021.

It is therefore clear that the first element of the *Combs* test for lost profits has been satisfied. With that in mind, the court therefore turns to the second element, causation. *Combs,* 466 N.E.2d at 887 (that "the loss of profits is the probable result of the breach of contract").

## CAUSATION

■ In a proceeding to collect damages for automatic stay violations, the burden of proof to establish causation falls upon the plaintiff. *In re Sharon,* 200 B.R. 181, 199 (Bankr.S.D.Ohio 1996) (Waldron, J.). This is the same burden of proof that applies to state law action to collect breach of contract damages in Ohio. *Schulke Radio Prods., Ltd. v. Midwestern Broad. Co.,* 6 Ohio St.3d 436, 453 N.E.2d 683, 686 (1983) ("The non-breaching party must establish the fact of damage and then sustain its burden of proof as to the amount of damage by proof on any reasonable basis.").

■ The quantum of proof is by preponderance-of-the-evidence in both federal contract damages cases and automatic stay cases. *Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) ("Because the preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants, we presume that this standard is applicable in civil actions between private litigants unless 'particularly important individual interests or rights are at stake.'") (citation omitted); *In re Sharon,* 200 B.R. at 199. In Ohio lost profit actions, the quantum of proof required is the higher standard of reasonable certainty. *AGF, Inc. v. Great Lakes Heat Treating Co.,* 51 Ohio St.3d 177, 555 N.E.2d 634, 639 (1990). Though the nature of this action is a federal action to collect civil contempt damages for violation of the automatic stay, this court has used its discretion in granting civil contempt, *see, e.g., United States v. Arkison (In re Cascade Roads, Inc.),* 34 F.3d 756, 767 (9th Cir.1994); *In re Xavier's of Beville, Inc.,* 172 B.R. 667, 671–72 (Bankr.M.D.Fla.1994), to condition damages upon a showing of state law damages. *In re Elder–Beerman,* 197 B.R. at 634. Thus this court will hold the Plaintiff to the higher reasonable certainty standard.

■ In addition, state court rulings help determine how a plaintiff can go about showing lost profit damages. Though the plaintiff must show by a reasonable certainty that the defendant's breach was the actual cause of the lost profits in question, *AGF, Inc.,* 555 N.E.2d at 639, it is not necessary for that proof of damages to be specific. *Combs,* 466 N.E.2d at 887 ("The plaintiff's evidence of lost future profits as an item of compensatory damages need only be reasonable, not specific."). Thus a showing of lost profits from a statistical analysis of facts in evidence is sufficient to establish lost profits damages. *Kinetico, Inc. v. Independent Ohio Nail Co.,* 19 Ohio App.3d 26, 482 N.E.2d 1345, 1350 (1984) ("'More is required of the plaintiff than merely his assertion (either directly or through an expert witness) that he would have made a particular amount in profits.'"); *Endersby v. Schneppe,* 73 Ohio App.3d 212, 596 N.E.2d 1081, 1084 (1991) ("'Unless the figure is substantiated by calculations based on facts available or in evidence, the courts will properly reject it as speculative or uncertain.'") (quoting R. DUNN, RECOVERY OF DAMAGES FOR LOST PROFITS 2d at 247–48, Section 6.3 (1981)).

■ In order to demonstrate that Elder–Beerman had sustained damages as a result of Thomasville's actions, Elder–Beerman first presented the testimony of Mike Nesbit, a marketing representative for Thomasville, *Testimony of Mike Nesbit,* October 24, 1996, Hearing Transcript pages 17–69 (hereinafter "1 *Testimony of Mike Nesbit* at ——"); Testimony of Mike Nesbit, October 25, 1996, Hearing Transcript pages 27–68 (hereinafter "2 *Testimony of Mike Nesbit* at ——");[1] and Ronald Bultema, a divisional merchandise manager for Elder–Beerman, *Testimony of*

---

**1.** As the hearing in question took place over two days and resulted in two separately paginated transcripts, testimony of witnesses who appeared at both days of the hearing will designated with a "1" for October 24 and a "2" for October 25, 1996.

*Ronald Bultema,* October 24, 1996, Hearing Transcript pages 69–122, 156–164 (hereinafter "1 *Testimony of Ronald Bultema* at ——"); *Testimony of Ronald Bultema,* October 25, 1996, Hearing Transcript pages 13–27 (hereinafter "2 *Testimony of Ronald Bultema* at ——"). Both Mr. Nesbit and Mr. Bultema testified to the facts underlying Thomasville's dealings with Elder–Beerman both prior to and subsequent to the bankruptcy petition.

Mr. Nesbit's testimony clarified many of the details involving what promotional incentives were or were not offered to Elder–Beerman. *See* 1 *Testimony of Mike Nesbit* at 30–31, 53–56. Even so, Mr. Nesbit's testimony still supported the facts presented at earlier hearings, that Thomasville ceased offering certain types of promotional discounts to Elder–Beerman following the commencement of Elder–Beerman's bankruptcy proceedings. *See* 1 *Testimony of Mike Nesbit* at 68; *see also Elder–Beerman Stores Corp. v. Thomasville Furniture Indus., Inc. (In re Elder–Beerman Stores Corp.),* 195 B.R. 1019, 1022 (Bankr.S.D.Ohio 1996). Mr. Nesbit also clarified that while his support visits to Elder–Beerman did decrease, they did not cease altogether. 1 *Testimony of Mike Nesbit* at 39, 45–46, 58–59.

Mr. Bultema testified in length about Elder–Beerman's advertising scheme, and how promotional discounts are an essential part of a retail business. 1 *Testimony of Ronald Bultema* at 80. He testified that "lack of promotional incentives forced Elder–Beerman not to advertise the Thomasville product." *Id.* at 85. He also testified that "[w]ithout the advertising [Elder–Beerman] did not do the business" and that "business dried up." *Id.* Mr. Bultema went on to state that once Mr. Nesbit resumed his normal contact with Elder–Beerman and once advertisement resumed, business increased "dramatically." *Id.* at 86. Though counsel for Thomasville attempted to establish in cross-examination of Mr. Bultema that Elder–Beerman's cessation of advertising was a voluntary choice made by Elder–Beerman and not dictated by Thomasville's lack of support, Mr. Bultema's testimony that "in the normal course of business, it makes ab-

solutely no sense for a retailer to run advertising on a vendor that is not giving promotional support, that is not giving the sales support, that is not there working to build a business" makes it very clear that this was not the case. *Id.* at 120. Though the court has heard testimony to the contrary, *see, e.g., Testimony of Steven Pierce* at 116–117, it appears clear from Mr. Bultema's testimony that the decision to stop advertising Thomasville products was within the sound business judgment of a retailer that had discovered it could not count on support from its supplier. 1 *Testimony of Ronald Bultema* at 120.

In order to quantify Mr. Bultema's observations that Thomasville sales "dried up," and to present the methodology for calculating lost sales discussed below, Elder–Beerman next presented the testimony of expert witness Mr. Julian Taub. *Testimony of Julian Taub,* October 24, 1996, Hearing Transcript pages 122–155, 165–222 (hereinafter "*Testimony of Julian Taub* at ——"). Mr. Taub testified that in his experience, retail business may expect a short-term dip in sales as a result of a bankruptcy petition, but ultimately this effect will cease to exist. *Testimony of Julian Taub* at 176.

Mr. Taub calculated this short-term bankruptcy effect by first determining the average monthly decline in total Elder–Beerman sales prior to the filing of the bankruptcy petition. *Id.* at 171–72. In August of 1995, total Elder–Beerman sales had declined by 9.5% over total August sales in 1994. *Id.* at 169, 171–72; Defendant's Exhibit F. In September and October of 1995, total sales also declined over 1994 sales for the same time period, by 7.0% and 8.6%, respectively. *Testimony of Julian Taub* at 169; Defendant's Exhibit F. Mr. Taub averaged these three percentage declines, and came up with the average monthly decline in total Elder–Beerman sales prior to bankruptcy as minus 8.4%. *Testimony of Julian Taub* at 169; Defendant's Exhibit F. Mr. Taub's conclusion was that had all factors remained the same, Elder–Beerman would have expected to see an average monthly decline of 8.4% from fiscal year 1994 to fiscal year 1995 for total sales in months November, December and January

(the fourth fiscal quarter). *Testimony of Julian Taub* at 169.

In comparison, Mr. Taub next computed the actual average monthly change of total Elder–Beerman sales for the months of November, December, and January from fiscal year 1994 to fiscal year 1995. *Id.* at 169; 171; Defendant's Exhibit F. In November of 1995, total Elder–Beerman sales declined by 17.4% over the same period in 1994. *Testimony of Julian Taub* at 169, 171; Defendant's Exhibit F; *see also* Plaintiff's Exhibit 60. In December of 1995, the actual change was a 13.7% decline over 1994. *Testimony of Julian Taub* at 169, 171; Defendant's Exhibit F; *see also* Plaintiff's Exhibit 60. In January of 1996, however, instead of seeing the expected decline, total actual sales rose 16.7% over 1995. *Testimony of Julian Taub* at 169, 171–72; Defendant's Exhibit F; *see also* Plaintiff's Exhibit 60. This rise led Mr. Taub to conclude that the bankruptcy effect had ceased as of January, 1996.[2] *Testimony of Julian Taub* at 169, 171–72; Plaintiff's Demonstrative Exhibit 81;[3] Defendant's Exhibit F. Mr. Taub then calculated the difference between the expected change and actual change for these months, and totaled these differences to come up with a total bankruptcy effect for the time period in question. *Testimony of Julian Taub* at 169, 171–72; Defendant's Exhibit F. These figures can be summarized as follows:

**TABLE 1:**

**Calculation of Bankruptcy Effect**

| | Expected Change (over 1994) | Actual Change (over 1994) | Difference |
|---|---|---|---|
| November 1995 | −8.4% | −17.4% | −9.0% |
| December 1995 | −8.4% | −13.7% | −5.3% |
| January 1996 | −8.4% | +16.7% | 0[4] |
| | | Total Bankruptcy Effect: | −14.3% |

Mr. Taub then computed an average monthly bankruptcy effect by dividing the total bankruptcy effect for this time period (−14.3%) by three, the number of months in question. *Testimony of Julian Taub* at 169, 171–72; Defendant's Exhibit F. While this calculation is ultimately incorrect, *see infra*, for the purposes of showing causation the court will continue to use Mr. Taub's numbers. The resulting average bankruptcy effect, rounded to the nearest whole number is −5%. *Testimony of Julian Taub* at 169, 171–72; Defendant's Exhibit F.

Finally, in order to establish that Thomasville's actions caused some effect on sales of

**2.** This conclusion is problematic in both its base assumption (that a rise assumes no bankruptcy effect) and in the computation of an average monthly bankruptcy effect (where Mr. Taub averaged over three months when he was only really considering two). The court will discuss this misanalysis in more detail in the later discussion of actual damages. *See infra.*

**3.** Although Plaintiff's Demonstrative Exhibit 81 was a demonstrative exhibit and not admitted as substantive evidence, the court will refer to Exhibit 81 as it conveniently summarizes the testimony given at trial by Mr. Taub. *See United States v. Paulino*, 935 F.2d 739, 752 (6th Cir.) (permitting the use of pedagogical devices that "organize the jury's examination of testimony and documents already admitted in evidence."),

*cert. denied sub nom. Vieyra v. United States*, 502 U.S. 914, 112 S.Ct. 315, 116 L.Ed.2d 257 (1991); *see also Trebmal Const., Inc. v. Dover Elevator Co.*, 943 F.2d 52, 1991 WL 165659, at *2 (6th Cir. Aug. 29, 1991) (unpublished disposition) (permitting the jury to examine during deliberations demonstrative exhibits not otherwise admitted into evidence). In addition, the majority of the information contained in Plaintiff's Demonstrative Exhibit 81 is merely a reproduction of calculations contained in Defendant's Exhibits A & F, which were admitted as substantive evidence.

**4.** This number represents Mr. Taub's conclusion that the bankruptcy effect had ceased in January of 1996.

Thomasville products at Elder–Beerman, it is necessary to demonstrate that sales of Thomasville products for the period in question behaved differently from the combination of the calculated expected change ($-8.4\%$) and the calculated bankruptcy effect ($-5\%$). Mr. Taub testified that actual sales of Thomasville goods at Elder–Beerman for the agreed damages period, roughly the fourth fiscal quarter of 1995 and the first fiscal quarter of 1996, declined dramatically in excess of those two figures. *Testimony of Julian Taub* at 152–153, 166–172; Defendant's Exhibit A. Actual sales of Thomasville goods at Elder–Beerman[5] for the fourth fiscal quarter were $468,500 in 1994 and $378,900 in 1995.[6] This represents a 19.1% decline in actual Thomasville sales from the fourth fiscal quarter in 1994 to the same quarter in 1995. *Compare with* Plaintiff's Demonstrative Exhibit 81; Defendant's Exhibit A.

For the first fiscal quarter of 1996, Mr. Taub performed a similar operation, calculating first the actual sales of the first fiscal quarter of 1995 ($637,900) and 1996 ($314,-300), and then the percent decline (50.7%) in actual Thomasville sales for these quarters. *Compare with* Plaintiff's Exhibit 76; Plaintiff's Demonstrative Exhibit 81; Defendant's Exhibit A.

By examining the percent decline for total Thomasville sales for the fourth quarters of 1995 (19.1%) over the same quarter in 1996 and the first quarter of 1996 (50.7%) over the same quarter in 1995,[7] it therefore becomes clear that these figures exceed Mr. Taub's calculations of expected decline (combined effect, 13.4% decline) due to a combination of a continuation of the trend of decline (expected 8.4% decline) and the effect of the bankruptcy petition (calculated 5% decline). Without considering Defendant's objections, it therefore seems clear that Elder–Beerman has met its burden of proof to demonstrate causation of lost profits damages under state

**5.** The court is faced with several possible sources for these sales figures. *See, e.g.,* Plaintiff's Exhibit 17, 19, 21, 76 & 81; Defendant's Exhibit A. Although as noted above, Plaintiff's Demonstrative Exhibit 81 is a demonstrative exhibit and has not been admitted as substantive evidence, Defendant's Exhibit A has been admitted and contains the same calculations. In addition, Plaintiff's Exhibit 76 contains totals of these monthly sales figures which, other than as noted below, match the calculated figures in Plaintiff's Demonstrative Exhibit 81 and Defendant's Exhibit A. Finally, the court can calculate these figures based upon the testimony of Mr. Bultema, *see* 1 *Testimony of Ronald Bultema* at 156–57, from Plaintiff's Exhibits 21, 19, and 17 (for fiscal years 1994, 1995, and 1996, respectively). As the testimony regarding the calculation of Plaintiff's Exhibit 76 was at best unclear, see the discussion regarding proffer of Plaintiff's Exhibit 76, October 24, 1996, Hearing Transcript pages 237–39, the court will rely on figures calculated by it from Plaintiff's Exhibits 21, 19, and 17. For a discussion of the calculation method, see 1 *Testimony of Ronald Bultema* at 156–57 and the example of this method performed by the court in Table 2, *infra*. The court will hereinafter use these calculated figures and subsequently recalculated figures without comment, unless circumstances necessitate special consideration.

**6.** These figures do not match the figures calculated by Mr. Taub in Plaintiff's Demonstrative Exhibit 81 and Defendant's Exhibit A, nor do they match the summary presented by Mr. Broderick in Plaintiff's Exhibit 76. *See* footnote 5, *supra*. The fourth quarter 1994 figure appears to be simply a difference in arithmetic and rounding (calculated as $468,500 versus Mr. Taub's figure of $469,900). When Defendant's Exhibit A is examined closely, however, it becomes clear the Mr. Taub performed an adjustment to the figure representing fourth quarter 1995 sales. Mr. Taub initially calculated the same figure computed by the court, $378,900. He then reduced that number by $27,060 to $351,840. Although no testimony was presented at trial as to the nature of this adjustment, it appears to the court that some attempt was made to account for the fact that the damages period agreed to by the parties, October 17, 1995 to July 31, 1996, *see Agreed Order*, Adv.Doc. # 81–1, at ¶ 3, does not start exactly at the beginning of the fourth fiscal quarter. *See, e.g.,* discussion regarding proffer of Plaintiff's Exhibit 76, October 24, 1996, Hearing Transcript pages 237–39. Even so, it appears that Mr. Taub confused fiscal quarters with calender quarters and attempted to *reduce* the calculated figure. Had Mr. Taub been attempting to include the remainder of October in the calculations for the fourth fiscal quarter, he would have *increased* the relevant time period and corresponding sales. As it is, Mr. Taub's adjustment inures to Elder–Beerman's benefit, as a reduction in fourth quarter 1995 sales by the above amount increases the decline in Thomasville from 19.1% to 25.1% (and any increase in sales decline can be attributed to Thomasville's conduct). As no testimony was presented regarding this adjustment, the court will confine its calculations to the actual numbers representing quarterly sales in Plaintiff's Exhibits 19 and 21.

**7.** *See* Table 4, *infra*.

law by way of calculations based on facts available and in evidence. *See, e.g., Endersby v. Schneppe,* 73 Ohio App.3d 212, 596 N.E.2d 1081, 1084 (1991).

Defendant has made several objections to Mr. Taub's analysis, summarized in Defendant's Exhibit M, including Mr. Taub's lack of personal knowledge to many events, Mr. Taub's failure to consider certain facts, and lack of direct evidence in Mr. Taub's testimony linking Thomasville's acts with any claim for damages. *See* Defendant's Exhibit M.

■ As to the first two objections, the court is mindful that Mr. Taub's statistical analysis does not require him to be aware of the real-life events surrounding Thomasville's violation of the automatic stay. Expert witnesses are qualified to issue opinions based upon both admissible and inadmissible evidence, even if the expert did not directly experience the underlying acts themselves. *See* FED.R.EVID. 702. Questions of whether an expert witness properly considered all underlying facts in forming an opinion are more properly issues of weight as opposed to admissibility, unless those omissions are so great as to cause the expert's opinion to be groundless. *Mannino v. International Mfg. Co.,* 650 F.2d 846, 853 (6th Cir.1981) ("Great liberality is allowed the expert in determining the basis of his opinions under Rule 703. Whether an opinion should be accepted is not for the trial judge. That is for the finder of fact."). *Compare* FED.R.EVID. 702 *with* FED.R.EVID.: 104. Because Mr. Taub's testimony was clearly relevant to the issue and was based in fact, it was admissible. *See, e.g., United States v. L.E. Cooke Co., Inc.,* 991 F.2d 336, 342 (6th Cir.1993); *see also Endersby,* 596 N.E.2d at 1084.

■ In addition, Defendant's objection to lack of direct evidence of causation runs contrary to established law. As noted above, in Ohio it is unnecessary for a plaintiff pleading lost profit damages to establish a direct causal connection between the defendants acts and the plaintiffs lost profits, other than that which can be established through calculations based on facts available and in evidence. *See, e.g., Charles R. Combs Trucking, Inc. v. International Harvester Co.,* 12 Ohio St.3d 241, 466 N.E.2d 883, 887 (1984) (stating that the burden is to show that "the loss of profits is the probable result of the breach of contract"); *Endersby v. Schneppe,* 73 Ohio App.3d 212, 596 N.E.2d 1081, 1084 (1991). Likewise, the nature of Mr. Taub's calculations of lost profit damages bears a striking resemblance to the computation of lost profits damages for new business. Although many jurisdictions have in the past adhered to the rule that new businesses may not receive lost profits damages, this is fast becoming the minority rule. *Mid–America Tablewares, Inc. v. Mogi Trading Co., Ltd.,* 100 F.3d 1353, 1365 (7th Cir.1996) (" 'The development of the law has been to find damages for lost profits of an unestablished business recoverable when they can be adequately proved with reasonable certainty.' ") (quoting ROBERT L. DUNN, RECOVERY OF DAMAGES FOR LOST PROFITS § 4.2 at 280). Until recently, the law of Ohio was to exclude such damages. *A.G.F. Inc. v. Great Lakes Heat Treating Co.,* 1989 WL 12934, at *7 (Ohio Ct.App. Feb. 16, 1989).

■ In 1990, the Ohio Supreme Court reconsidered the issue of whether a new business may receive lost profits damages for breach of contract, and concluded that such damages may be awarded if the damages are proven with reasonable certainty. *AGF, Inc. v. Great Lakes Heat Treating Co.,* 51 Ohio St.3d 177, 555 N.E.2d 634, 639 (1990). In considering the issue, the court was persuaded by analysis contained within the Restatement of Contracts 2d, which provides that lost profits for new businesses "may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like." RESTATEMENT OF CONTRACTS 2d, § 352, Comment b. In this case, the court finds that Mr. Taub's analysis conforms with the degree of reasonable certainty considered in the Restatement of Contracts 2d, and ultimately in conformance with Ohio's law of lost profit damages recovery. *See, e.g., AGF, Inc. v. Great Lakes Heat Treating Co.,* 51 Ohio St.3d 177, 555 N.E.2d 634, 639 (1990).

■ Finally, Defendant does correctly point out that under Ohio law, a plaintiff

seeking to recover lost profits damages must give weight to intervening factors, other than the purported breach of contract, that may have contributed to lost sales, and thus lost profits. *See, e.g., Rhodes v. Rhodes Indus., Inc.,* 71 Ohio App.3d 797, 595 N.E.2d 441, 448–49 (1991). Though this is a concern that is most problematic in the computation of damages, failure to address intervening factors might also affect a statistical showing of causation. Presumably if factors other than the breach of contract are considered, the above showing of causation might be lessened or abrogated altogether. Thus while it will be necessary to reconsider this issue when considering the calculation of damages, the court will briefly consider this question here.

Thomasville stressed several intervening factors which might have affected sales of Thomasville products at Elder–Beerman, including Elder–Beerman's discontinuation of advertising through the breach period, economic and demographic factors, weather, store and product specific policies, and the impact of several furniture-related bankruptcies and store closings in the Cincinnati area. *See* Testimony of Steven Pierce, October 25, 1996, Hearing Transcript pages 68–141 (hereinafter *"Testimony of Steven Pierce* at ——"); Defendant's Exhibits P & Q.

As to the issue of advertising, though Thomasville spent much time at trial examining witnesses as to the interruption of advertising and its effect on sales, *see, e.g., Testimony of Steven Pierce* at 116–117, the court has already stated its conclusion the Elder–Beerman's "decision" to stop advertising is not truly a decision, but rather a necessary consequence of Thomasville's change in support levels. *See infra.* As such, advertising is not properly an intervening factor as considered in *Rhodes,* but rather an element of the breach itself. *See, e.g., Rhodes,* 595 N.E.2d at 448–49.

Other factors raised by Thomasville's expert witness Steven Pierce include general factors such as weather and changes in Elder–Beerman policies, which would have affected all Elder–Beerman sales, and more specific factors such as bankruptcies within the furniture industry and competition within the local furniture market. *See* Defendant's Exhibit P.

In addressing general intervening factors, it is important to note that Mr. Taub's analysis in computing a bankruptcy effect, *see* Table 1 *infra,* is in actuality an analysis of all post-petition factors affecting Elder–Beerman sales, not just the bankruptcy itself. As Mr. Taub's analysis contrasts changes in Thomasville sales against changes in total Elder–Beerman sales, the analysis factors out general factors which would have affected both Thomasville sales and general Elder–Beerman sales.

As to furniture-specific factors, Mr. Taub testified that he compared changes in Thomasville sales with changes in sales of non-Thomasville furniture at Elder–Beerman. *See Testimony of Julian Taub* at 199. Mr. Taub's analysis, summarized in Plaintiff's Demonstrative Exhibit 79, demonstrates that Thomasville sales were affected in a disproportionate manner from sales of non-Thomasville furniture at Elder–Beerman during the damages period. *Id.;* Plaintiff's Demonstrative Exhibit 79. As such, it is clear to the court that these possible intervening factors do not serve to defeat Plaintiff's showing of causation. The court will, however, revisit this issue when considering the calculation of damages.

It is therefore the court's conclusion that the testimony of Messrs. Nesbit and Bultema, as well as the calculations of Mr. Taub, have met the state law criteria for demonstrating causation in lost profits damages. *See Charles R. Combs Trucking, Inc. v. International Harvester Co.,* 12 Ohio St.3d 241, 466 N.E.2d 883, 887 (1984); *see also AGF, Inc. v. Great Lakes Heat Treating Co.,* 51 Ohio St.3d 177, 555 N.E.2d 634, 639 (1990); *Schulke Radio Prods., Ltd. v. Midwestern Broad. Co.,* 6 Ohio St.3d 436, 453 N.E.2d 683, 686 (1983); *Rhodes v. Rhodes Indus., Inc.,* 71 Ohio App.3d 797, 595 N.E.2d 441, 448–49 (1991); *Kinetico, Inc. v. Independent Ohio Nail Co.,* 19 Ohio App.3d 26, 482 N.E.2d 1345, 1350 (1984).

### DAMAGES

Plaintiffs, having established profits were within the contemplation of the parties

at the time the contract was made and that a loss of profits, if any, was the probable result of Thomasville's actions, must seek to establish the third and final element of the Combs test, that "the profits are not remote and speculative and may be shown with reasonable certainty." *See Charles R. Combs Trucking, Inc. v. International Harvester Co.,* 12 Ohio St.3d 241, 466 N.E.2d 883, 887 (1984). As the Ohio Supreme Court stated in a later case, "in order for a plaintiff to recover lost profits in a breach of contract action the amount of the lost profits, as well as their existence, must be demonstrated with reasonable certainty." *City of Gahanna v. Eastgate Properties, Inc.,* 36 Ohio St.3d 65, 521 N.E.2d 814, 818 (1988).

## THE COURT'S ROLE IN DETERMINING DAMAGES

■■■■ In addition to the state-law legal standard for finding lost profits damages, *see, e.g., Eastgate Properties,* 521 N.E.2d at 818, the court is vested with the duty of finder of fact when calculating such damages, should any be found. *Hardin v. Caldwell (In re Caldwell ),* 851 F.2d 852, 857 (6th Cir.1988) ("In a bankruptcy proceeding, the bankruptcy court is the finder of fact."); *see also* Fed.R.Bankr.P. 8013. When the court, as finder of fact, is not presented with an adequate method by which to calculate damages, it is within the discretion of the court to perform its own calculations as would a jury under like circumstances. *See Downs v. United States,* 522 F.2d 990, 1006 (6th Cir. 1975).

In *Downs,* the district court was faced with calculating damages in a wrongful death action. Having found the plaintiffs were legally permitted to recover under applicable law, the district court went about calculating an award of damages that it in its discretion deemed appropriate. *Downs v. United States,* 382 F.Supp. 713, 739 (M.D.Tenn. 1974), *rev'd,* 522 F.2d 990 (6th Cir.1975). While the Sixth Circuit reversed on the ultimate issue of law, the panel commended the district court on the court's performance of its duties as finder of fact. *Downs,* 522 F.2d at 1006. In so doing, the Sixth Circuit panel

cited the controlling jurisdiction's law on jury awards, and stated that "[t]he rule is no different when a judge acts as the finder of fact, as the District Court did here." *Id.*

■■■ In Ohio, the finder of fact is not limited in calculating damages to those theories and methods of calculation presented at trial. As the Ohio Supreme Court has stated in the related context of calculating damages for future earnings in a tort case, the jury was not "bound to accept any particular argument or expert calculation. The jury could have chosen to opt for various hybrid calculations by accepting parts of each expert's testimony or other testimony." *Buchman v. Wayne Trace Local School Dist. Bd. of Educ.,* 73 Ohio St.3d 260, 652 N.E.2d 952, 966 (1995); *see also Falls Steel Tube & Mfg. Co. v. Trumark, Inc.,* 73 F.3d 361, 1995 WL 750541, at *3 (6th Cir. Dec. 18, 1995) (approving a jury finding of damages "substantially below that recommended by plaintiff's expert") (unpublished disposition); *Cleveland Cotton Products v. James,* 1996 WL 631079, at *2 (Ohio Ct.App. Oct. 31, 1996) (approving jury determination of lost profits, "particularly where [Defendant] provided no formula of its own to determine lost profits.").

Thus while the court finds fault with several of the calculations performed by Plaintiff's expert Mr. Taub, if, as is the case here, the court has found that the standard for causation has been met, the court has the responsibility of independently performing the calculations as would a finder of fact. As such, the court will first reexamine Mr. Taub's calculation of the bankruptcy effect before proceeding to the actual calculation of damages. *See Brookeside Ambulance, Inc. v. Walker Ambulance Serv.,* 112 Ohio App.3d 150, 157–59, 678 N.E.2d 248, 253–54 (1996) ("The trial court has the discretionary power to determine whether an expert's calculation of lost profits is too speculative.") (citing *Illinois Controls, Inc. v. Langham,* 70 Ohio St.3d 512, 639 N.E.2d 771, 782–783 (1994)).

## THE BANKRUPTCY EFFECT

■■■ Before proceeding to analyze Mr. Taub's calculations of damages, it is necessary to revisit his calculation of the bank-

ruptcy effect. As previously stated, in determining the bankruptcy effect, Mr. Taub calculated the average monthly decline in total Elder–Beerman sales prior to the filing of the bankruptcy petition. *See* Table 1, *supra; see also Testimony of Julian Taub* at 171–72. The figure, which represents the expected decline of sales in the damages period, was calculated as a drop of 8.4%. *See Testimony of Julian Taub* at 169; Defendant's Exhibit F. Mr. Taub's conclusion was that had all factors remained the same, Elder–Beerman would have expected to see an average monthly decline of 8.4% from fiscal year 1994 to fiscal year 1995 for total sales in months November, December and January (the fourth fiscal quarter). *See Testimony of Julian Taub* at 169. The court finds no error with this calculation, and will use the figure of −8.4% for the expected change.

Mr. Taub next computed the actual average monthly change of total Elder–Beerman sales for the months of November, December, and January from fiscal year 1994 to fiscal year 1995. *See supra; see also Testimony of Julian Taub* at 169; 171; Defendant's Exhibit F. Using these figures, and the figure for expected change (−8.4%) calculated above, Mr. Taub then calculated the difference between the expected change and actual change for months November through January, and totaled these differences to come up with a total bankruptcy effect for the time period in question. *See* Table 1, *supra; see also Testimony of Julian Taub* at 169, 171–72; Defendant's Exhibit F. It is in performing this calculation the Mr. Taub makes an assumption that is unsupported by the evidence.

Because the total sales for January of 1996 actually rose over those from the same month in 1995 (+16.7%), Mr. Taub assumed that the bankruptcy effect had ceased. *See supra; see also Testimony of Julian Taub* at 169, 171–72; Plaintiff's Demonstrative Exhibit 81; Defendant's Exhibit F. Even so, he still averaged the bankruptcy effect over three months, November through January, using zero as the value for the bankruptcy effect in January. *See* Table 1, *supra*. The resulting figure for the bankruptcy effect

(−5%) factors January out of the monthly totals while still using January in calculating the average.

Mr. Taub's conclusion that the bankruptcy effect had ceased in January is not inconsistent with the testimony, *see, e.g., Testimony of Julian Taub* at 172 & 176, the conclusion simply manifests itself incorrectly in Mr. Taub's calculations. It seems clear to the court that Mr. Taub must either recognize the positive effect of January when calculating the bankruptcy effect and averaging over three months, or entirely discount January in his calculations and average over two. If Mr. Taub were to recognize the former effect, that the bankruptcy might actually cause sales to rise, the net result would be even more beneficial to Elder–Beerman than Mr. Taub's erroneous average. This is because a smaller negative, or even a positive bankruptcy effect would allow Elder–Beerman to attribute more of the decline in sales to Thomasville. It is clear from the data that the bankruptcy effect had ceased for total sales at Elder–Beerman as of January. *See, e.g.,* Plaintiff's Exhibit 63 (which shows that total Elder–Beerman sales rose over the previous year in both January and February of 1996). As such, the court will choose the latter method, averaging over only two months. Though this is less beneficial to the Plaintiff and is a small time period over which to perform an average, this is consistent with the evidence before the court and Elder–Beerman, the party bearing the burden of proof, has failed to provide the court with a superior method. Thus a more accurate calculation of average bankruptcy effect would be the total bankruptcy effect from Table 1 (−14.3%), averaged over the two months in which the effect was operative. The court will therefore use −7.15% as the bankruptcy effect in performing its calculation of damages.

## CALCULATING LOST SALES

Mr. Taub's analysis of lost sales is predicated on two fairly basic assumptions: 1) It is possible to predict what sales might have been in the fourth fiscal quarter of 1995 and first fiscal quarter of 1996 by analyzing the trend of known sales for the quarters outside

of the damages period. Once this prediction is made, the difference between the calculated sales and the actual sales will represent both Thomasville's actions and other factors common to all Elder–Beerman sales. *Testimony of Julian Taub* at 169, 171–72. 2) By factoring out calculable losses due to factors common to all Elder–Beerman sales, the remaining difference between predicted sales and actual sales must be the lost sales due to Thomasville's actions. *Id.* While the court ultimately disagrees with Mr. Taub's method of predicting what sales might have been for the damages period, the court finds that Mr. Taub's analysis is otherwise sound and will use Mr. Taub's methodology in performing its own calculations.

In order to calculate lost sales, it was necessary for Mr. Taub to first establish the actual sales of Thomasville products at Elder–Beerman for each of the quarters in 1994 and 1995, and the two known quarters in 1996. As discussed previously, these figures are available in summary format in Plaintiff's Exhibits 76 & 81 and Defendant's Exhibit A. *See infra* footnote 3. As the method through which these figures were calculated is uncertain, and Mr. Bultema has testified as to a certain method of calculating these figures from Plaintiff's Exhibits 21, 19, and 17 (for fiscal years 1994, 1995, and 1996, respectively), the court will rely on this method instead of the figures presented by Mr. Taub. *See Testimony of Ronald Bultema* at 156–57.

Thus in order to establish the actual sales for any given quarter by the method testified to by Mr. Bultema, sales figures must be extracted from documents produced by Elder–Beerman and admitted into evidence at trial. *Id.; see also* Plaintiff's Exhibits 21, 19, and 17. For example, to establish the actual sales for the first quarter of 1994, reference must be made to Exhibit 21, the Manufacturer Analysis Group List for fiscal year 1994. This document is separated into pages by season (Summer or Fall) and by accounting class (Gallery Occasional Furniture, Gallery Curios and Walls, etc.). On each page, the total net sales are provided for each month in question. Thus, the total net sales for the first fiscal quarter of 1994 would calculated from Exhibit 21 as follows:

**TABLE 2:**

**Total Net Sales of Thomasville Products for 1st Fiscal Quarter of 1994 (in thousands)** [8]

|  | Net Sales: |
|---|---|
| February '94 Gallery Occasional Furniture | 7.5 |
| February '94 Gallery Curios and Walls | 15.2 |
| February '94 Gallery Bedroom | 54.1 |
| February '94 Gallery Dining Room | 18.4 |
| February '94 Gallery Upholstered Furniture | 19.5 |
| March '94 Gallery Occasional Furniture | 21.4 |
| March '94 Gallery Curios and Walls | 16.5 |
| March '94 Gallery Bedroom | 51.1 |
| March '94 Gallery Dining Room | 25.3 |
| March '94 Gallery Upholstered Furniture | 33.4 |
| April '94 Gallery Occasional Furniture | 8.6 |
| April '94 Gallery Curios and Walls | 26.3 |
| April '94 Gallery Bedroom | 50.8 |
| April '94 Gallery Dining Room | 43.4 |
| April '94 Gallery Upholstered Furniture | 36.4 |
| Total Net Sales for 1st Fiscal Quarter of 1994 | 427.9 |

**8.** Figures summarized from Plaintiff's Exhibit 21 by the method testified to by Mr. Ron Bultema. *See Testimony of Ronald Bultema* at 156–57; Plaintiff's Exhibit 21.

Using this method, the court has recalculated the actual quarterly sales of Thomasville products at Elder–Beerman for 1994 through the known quarters of 1996 as follows:

## TABLE 3:

### Actual Sales of Thomasville Products for the First Quarter of 1994 through the Second Quarter of 1996 (in thousands) [9]

| Quarter | 1994 | 1995 | 1996 |
|---------|--------|--------|--------|
| 1 | $427.9 | $637.9 | $314.3 |
| 2 | $343.5 | $544.7 | $837.6 |
| 3 | $358.8 | $762.7 | |
| 4 | $468.5 | $378.9 | |

Based upon these figures, it is possible to calculate to what degree the known fiscal quarters of 1995 and 1996 represent a change over the same quarters in the preceding year:

## TABLE 4:

### Percent Change in Sales of Thomasville Products for the First Quarter of 1994 through the Second Quarter of 1996 (in thousands) [10]

| Quarter | 1994 | 1995 | % Change | 1996 | % Change |
|---------|--------|--------|----------|--------|----------|
| 1 | $427.9 | $637.9 | +49.1% | $314.3 | −50.7% |
| 2 | $343.5 | $544.7 | +58.6% | $837.6 | +53.8% |
| 3 | $358.8 | $762.7 | +112.6% | | |
| 4 | $468.5 | $378.9 | −19.1% | | |

It is clear, therefore, that Elder–Beerman experienced a loss of sales in the fourth fiscal quarter of 1995 and the first fiscal quarter of 1996 over the corresponding quarters in the previous year. At this point, if Mr. Taub had presumed that sales would remain constant from year to year, an approximation of lost sales could be reached by a relatively simple method:

## FIGURE 1

### Calculation of Damages Assuming Constant Sales from Previous Year

(% Change) − (Expected Change) − (Bankruptcy Effect) = Change due to Thomasville

The lost sales for the fourth fiscal quarter, using Mr. Taub's calculation of expected change and the court's calculation of % change and the bankruptcy effect, would be calculated as follows:

## FIGURE 2

### Calculation of Fourth Quarter Damages Assuming Constant Sales from Previous Year

(% Change) − (Expected Change) − (Bankruptcy Effect) = Change due to Thomasville

(−19.1%) − (−8.4%) − (−7.15%) = Change due to Thomasville

−3.55% = Change due to Thomasville

9. With the exception of second quarter 1996, the figures summarized are from Plaintiff's Exhibits 21, 19, and 17 by the method testified to by Mr. Ron Bultema. *See Testimony of Ronald Bultema* at 156–57; Plaintiff's Exhibits 21, 19, and 17. Second quarter 1996 figure is taken from Plaintiff's Exhibit 76 as Exhibit 17 did not contain data through this period.

10. Figures summarized from Plaintiff's Exhibits 21, 19, and 17, and equal to figures in Mr. Taub's analysis given in Plaintiff's Demonstrative Exhibit 81. Percentages are rounded to the nearest tenth of a percentile.

Thus if Mr. Taub had assumed that sales from the fourth fiscal quarter of 1995 would have remained constant from the fourth fiscal quarter of 1994, the lost sales in this quarter due to Thomasville's actions would equal a −3.55% decline over the same quarter in 1994, or a loss of $16,630.00 (−3.55% × $468,500.00).[11] The court has performed a similar analysis for the first quarter of 1996, absent the adjustment for bankruptcy effect:[12]

**FIGURE 3**

**Calculation of First Quarter Damages Assuming Constant Sales from Previous Year**

$$(\% \text{ Change}) - (\text{Expected Change}) = \text{Change due to Thomasville}$$

$$(-50.7\%) - (-8.4\%) = \text{Change due to Thomasville}$$

$$-42.30\% = \text{Change due to Thomasville}$$

The lost sales in the first fiscal quarter of 1996 due to Thomasville's actions would equal a −42.30% decline over the same quarter in 1995, or a loss of $269,831.70 (−42.30% × $637,900.00). Under the assumption that sales remain constant from year to year, the correct calculation of lost Thomasville sales would therefore be $286,461.70 ($16,630.00 + $269,831.70).[13]

Mr. Taub did not assume that sales would remain constant from year to year, however. Instead, he assumed that sales would follow the trend witnessed in the first three quarters of 1995. Sales of Thomasville goods in the first quarter of 1995 rose by 49.1% of sales in the same quarter in 1994. *See* Table 4, *supra*. The second quarter of 1995 realized an even greater gain over the corresponding quarter in 1994, 58.6%. *Id.* The third fiscal quarter realized the greatest gain of all, 112.6%. *Id.*

Mr. Taub observed that Thomasville sales for these quarters were rising, and from that observation, he predicted that but for the bankruptcy and Thomasville's actions, sales would have continued this trend into the fourth fiscal quarter. *Testimony of Julian Taub* at 170–71. Using the highly problematic "trend" analysis, Mr. Taub predicted that sales for the fourth fiscal quarter of 1995 would have risen 145% over the same quarter in 1994, had there been neither a bankruptcy petition nor the actions to terminate the Elder–Beerman/Thomasville relationship taken by the Defendants. *Id.* at 171. For the first fiscal quarter of 1996, Mr. Taub abandoned his trended analysis and simply predicted that sales for this quarter would have risen at the same rate as sales in the second quarter of 1996, by 51.6%.[14] *Id.* at 172.

In examining these predictions by Mr. Taub, the court cannot help but be

11. For the source of these numbers, see Table 4, *supra*.

12. As previously stated, Mr. Taub's presumption that the bankruptcy effect had ceased in January was not necessarily incorrect, it was simply improperly used in his calculations.

13. This calculation of lost sales must still be reduced to lost profits, as the Plaintiff in a lost profits case is unentitled to collect more in damages than it would have had it expended its normal incremental expenses to achieve the prof-

its in question. *Schulke Radio Prods., Ltd. v. Midwestern Broad. Co.,* 6 Ohio St.3d 436, 453 N.E.2d 683, 686 (1983). This issue will be examined immediately following the analysis of lost sales.

14. This percentage differs from the percentage calculated by the court in Table 4, *supra*, in that it is based on the original figures relied upon by Mr. Taub in performing his calculations. *See, e.g.,* Plaintiff's Demonstrative Exhibit 81.

struck by the apparent randomness of the Mr. Taub's methods in reaching the given percentages. As to the first prediction, Mr. Taub simply assumed that sales would continue in their upward trend indefinitely, and made little or no attempt to relate his prediction to the factors underlying the dramatic increases in fiscal quarters one through three of 1995. In addition, although Mr. Taub testified that "it is reasonable to assume" that the first fiscal quarter of 1996 would have matched the increase seen in the second quarter, he bases this prediction solely on the presumption that promotional activities and discounts would have been the same for both quarters.

When considering Mr. Taub's predicted rise of 145% in the fourth quarter, the court is sympathetic to the criticisms proffered by Defendant's expert witness, Mr. Steven Pierce. For example, Mr. Pierce testified that the unusual growth pattern in the beginning of 1995 is attributable to the opening of new Thomasville stores in 1994 (Fairborn) and mid 1995 (Salem). *Testimony of Steven Pierce* at 90. As to late 1995 and early 1996, when sales were no longer experiencing the rises due to opening new Thomasville locations, Mr. Pierce testified that sales would have been more likely to level off. *See Testimony of Steven Pierce* at 90 ("[Y]ou would expect sales to stay flat. . . ."); *see also id.* at 135. In addition, Mr. Bultema testified to the possible effect on local furniture sales of additional furniture retailer bankruptcies in the nearby regions. 2 *Testimony of Ronald Bultema* at 51; *see also* Defendant's Exhibit Y. This factor, addressed by the court earlier when considering causation, is clearly one which would militate against the possibility of an unchecked rising trend.

The court is aware of one unpublished Sixth Circuit opinion where the panel permitted a showing of lost profits based upon sales predicted from unusually strong sales. *Falls Steel Tube & Mfg. Co. v. Trumark, Inc.*, 73 F.3d 361, 1995 WL 750541 (6th Cir. Dec. 18, 1995) (unpublished disposition). That panel upheld a jury award of lost profits under Ohio law where the estimate of profits was based upon an "anomalously strong quarter" and a "trend of improving profits." *Id.* at *3.

In reaching that conclusion, the panel cited no evidence that would indicate that the rising trend would either continue or cease. *Id.*

It is this court's conclusion that the issues raised by Defendant's expert witness are sufficient to rebut any allegation of an unchecked trend of rising profits. Mr. Taub's failure to consider what factors had caused the rising trend in question and whether those factors still remained makes any prediction based on that trend questionable at best. For these reasons the court rejects Mr. Taub's calculations of the fourth quarter predicted sales.

█ Unlike the fourth quarter prediction, which is based upon questionable statistics, the first quarter prediction is simply arbitrary. Based upon questionable conclusions regarding the resumption of promotional activities, Mr. Taub makes the assumption that first quarter sales would be equal to the known second quarter sales. In so doing, Mr. Taub fails to address why sales he had predicted would continue to rise through the fourth quarter would suddenly drop to nearly a third of the previously predicted growth rate. The court finds Mr. Taub's calculation of the first quarter predicted sales even more questionable than the previously rejected fourth quarter prediction, and it is likewise rejected.

Having accepted Mr. Taub's general methodology, and having found that the plaintiff's burden of proving causation has been met, the court is faced with the difficult task of substituting its predictions for plaintiff's expert's predictions. As previously discussed, it is within the discretion of the court as finder of fact to substitute its own factual conclusions for those of Plaintiff's expert. *See Hardin v. Caldwell (In re Caldwell )*, 851 F.2d 852, 857 (6th Cir.1988); *Downs v. United States*, 522 F.2d 990, 1006 (6th Cir.1975); *Buchman v. Wayne Trace Local School Dist. Bd. of Educ.*, 73 Ohio St.3d 260, 652 N.E.2d 952, 966 (1995); *Cleveland Cotton Products v. James*, 1996 WL 631079, at *2 (Ohio Ct. App. Oct. 31, 1996); *see also Falls Steel Tube & Mfg. Co. v. Trumark, Inc.*, 73 F.3d 361, 1995 WL 750541, at *3 (6th Cir. Dec. 18, 1995) (unpublished disposition).

## REDUCING LOST SALES
## TO LOST PROFITS

Defendant Thomasville argued at trial that the analysis performed by Mr. Taub, which the court has essentially followed to this point, errs in that it computes damages by reducing lost sales to lost gross profits, not lost net profits. *See, e.g., Testimony of Steven Pierce* at 96–103. Following Mr. Taub's methodology, once lost Thomasville sales have been reduced to a dollar figure, these sales are reduced to lost profits by multiplying them by Elder–Beerman's gross profit margin percentage. *See Testimony of Julian Taub* at 172; Plaintiff's Demonstrative Exhibit 81, Defendant's Exhibit A. Elder–Beerman's gross profit margin percentage for sales of Thomasville furniture in 1995 was 25.88%. *See* Plaintiff's Exhibit 28; 1 *Testimony of Ronald Bultema* at 158–159.

■ The law is clear that a Plaintiff in a lost profits case is not permitted to recover damages for amounts that would have been expended in incurring the profits in question. *See Schulke Radio Prods., Ltd. v. Midwestern Broad. Co.,* 6 Ohio St.3d 436, 453 N.E.2d 683, 686 (1983). This is consistent with the general contract principle that a plaintiff in a breach of contract action is not entitled to recover more than the Plaintiff would have received had the contract been fully performed. *James v. Board of Comm'rs,* 44 Ohio St. 226, 6 N.E. 246, 251 (1886).

This does not mean that a gross profits calculation of lost profits is always unacceptable, however. The Ohio Supreme Court has recognized that a Plaintiff need not make a showing of expenses saved when there were no such expenses. *Digital & Analog Design Corp. v. North Supply Co.,* 44 Ohio St.3d 36, 540 N.E.2d 1358 (1989). In that case, the court stated that "where there would have been no additional costs to the party to generate those profits which he lost, or where he was in fact not relieved from the particular costs which constituted his ongoing and fixed overhead costs, then he need only assert and prove such circumstances." *Id.* at 1362.

In the case at bar, Defendant alleges that Plaintiff neglected to consider several incremental expenses, including sales commissions, delivery costs, warehouse costs, credit expenses, and advertising expenses. *See* Defendant's Exhibit 0.

■ As to the issue of sales commissions, Plaintiff's witness Mr. Ronald Bultema testified that there were no incremental sales commission expenses during this period, as sales persons were paid a draw on their commission based upon their previous year's sales. *See* 1 *Testimony of Ronald Bultema* at 101–102. In addition, Mr. Bultema testified that delivery costs were accrued and taxed directly to the customer on each individual order, a $30.00 charge based upon a $30.00 cost to the delivery facility. *Id.* at 102. Thus a change in the volume of sales would neither increase nor decrease the costs to Elder–Beerman.

■ As to the objection regarding credit card expense, the court finds that the issue regarding bad debt expense raised in Defendant's Exhibit 0 has already been accounted for by the reduction of gross yield by cost of funds to achieve net finance charge yield. *See infra; see also Testimony of Timothy Broderick* at 257. Regarding the issue of outside charge card expense, the court agrees with Mr. Pierce's observation that outside charge cards, i.e. charge cards other than Elder–Beerman's store card, have not been accounted for in Mr. Taub's methodology. *See* Testimony of Steven Pierce at 100. Mr. Pierce testified that for each purchase on an outside credit card made at Elder–Beerman, Elder–Beerman must pay a surcharge of 1.46%. *Id.; see also* Defendant's Exhibit HH (Deposition of Timothy Broderick). The court can find no evidence as to what percentage of furniture purchases made at Elder–Beerman are made with outside credit cards. Mr. Timothy Broderick, Elder–Beerman's Vice–President of Credit, did testify, however, that 74% of all furniture sales at Elder–Beerman are made using the Elder–Beerman store credit card. *See infra;* 1 *Testimony of Timothy Broderick* at 241–42. Of the remaining 26%, no testimony was presented as to what portion of those sales were made on outside credit cards or by other means. Given that the Plaintiff bears

the burden of going forward in a lost profits case, *see Schulke Radio Prods.*, 453 N.E.2d at 686, and that the Ohio Supreme Court has established the requirement that gross profits are nonreimbursable unless circumstances to the contrary are shown, *see id.; see also Digital & Analog Design Corp.*, 540 N.E.2d at 1362, the court is given no other option than to assume that the entire 26% of these furniture sales were made on outside charge cards. Thus the court will reduce Mr. Taub's gross profit margin of 25.88% by .38% (26% of 1.46) to account for these expenses, and will go forward with the calculations using a net profit margin of 25.5%.

■ Last, the court finds that the issue of saved advertising expenses is not a proper saved cost, as Mr. Bultema testified that while advertising dollars were not spent on Thomasville during this period, they continued to be spent in the same rate. *See* 2 Testimony of Ronald Bultema at 103.

It is therefore the court's conclusion that having reduced the gross profit margin to net profit margin by accounting for credit card expenses, Mr. Taub's lost profits calculations will meet with Ohio law in this regard. *See, e.g., Digital & Analog Design Corp. v. North Supply Co.*, 44 Ohio St.3d 36, 540 N.E.2d 1358 (1989); *Charles R. Combs Trucking, Inc. v. International Harvester Co.*, 12 Ohio St.3d 241, 466 N.E.2d 883, 887 (1984). It is therefore necessary for the court to determine what sales in the fourth quarter of 1995 and the first quarter of 1996 would have been, absent Thomasville's actions (and the previously calculated Bankruptcy Effect).

■ Having previously rejected the contention of Plaintiff's expert witness that sales of Thomasville products would have continued to rise unchecked in the fourth quarter of 1995, the court finds itself in the difficult position of predicting what sales would have been instead. One method would be to assume that sales would have leveled off from the previous quarter, as was testified to by Defendant's expert witness Mr. Pierce. *See*

*Testimony of Steven Pierce* at 90 ("[Y]ou would expect sales to stay flat...."). This presumption has at least two problems. First, it ignores the fact that quarterly sales are dependent on the season in which the quarter occurs. Thus to predict that sales volume in the fourth quarter of 1995 would have been the same as sales in the third quarter neglects the fact that retail fourth quarter sales normally reflect stronger sales, as a result of holiday sales in the month of December. In addition, as was the case with Mr. Taub's prediction of rising sales, the second quarter of 1996, when the effects of both the bankruptcy and Thomasville's actions were presumed to have ceased, does not reflect such a leveling off. Instead, the second quarter of 1996 shows a drop in rate of increase over the previous year's sales. *See* Plaintiff's Demonstrative Exhibit 81; Defendant's Exhibit A.

It is the court's conclusion that the only logical prediction possible is one made from all of the quarters in question. By examining the rate of growth of the known quarters of 1995 and 1996, *see* Table 4 *supra*, the court finds that the average rate of growth was 68.5%. This percentage represents the average of the rates of growth for the first, second, and third fiscal quarters of 1995 and the second fiscal quarter of 1996. *Id.*

Before the court can recalculate the change due to Thomasville based upon this new expected rise, it is necessary to compute the difference between the actual change and projected change for both of the quarters in question. For the fourth quarter of 1995, the change would equal the actual change (−19.1), *see* Table 4 *supra*, minus the projected change (68.5%). Thus for the fourth quarter of 1995, the change from projected equals a decline of 87.6%. The same calculation performed for the first fiscal quarter of 1996 results in a decline from projected change of 119.2% (−50.7% −68.5%). *Id.*

Thus, using these figures in the formula contained in Figure 1, *supra*, it is possible to compute a change due to Thomasville for the quarters in question:

**FIGURE 4** [15]

---

**A. Calculation of Fourth Quarter Damages Assuming Increase from Previous Year**

(% Change) − (Expected Change) − (Bankruptcy Effect) = Change due to Thomasville

(−87.6) − (−8.4%) − (−7.15%) = Change due to Thomasville

−72.05% = Change due to Thomasville

**B. Calculation of First Quarter Damages Assuming Increase from Previous Year**

(% Change) − (Expected Change) = Change due to Thomasville

(−119.2%) − (−8.4%) = Change due to Thomasville

−110.8% = Change due to Thomasville

---

As before, these changes can be converted to dollar amounts by multiplying the percent change due to Thomasville by that quarter's previous sales. Thus assuming that sales in the fourth fiscal quarter of 1995 would have risen the same as the known quarters, the lost sales in this quarter due to Thomasville's actions would equal a −72.05% decline over the same quarter in 1994, or a loss of $337,554.25 (−72.05% × $468,500.00). The lost sales in the first fiscal quarter of 1996 due to Thomasville's actions would equal a −110.8% decline over the same quarter in 1995, or a loss of $706,793.20 (−110.8% × $637,900.00).

Thus from the calculations performed above, the court finds a total loss of Thomasville sales resulting from Thomasville's actions in the amount of $1,044,347.45 ($337,554.25, fourth quarter loss, plus $706,793.20, first quarter). Multiplying this figure by the previously discussed percentage for net profit margin, 25.5%, the court calculates Elder–Beerman's lost profits due to lost Thomasville sales as $266,308.60.

Finally, the court feels it necessary to address one additional anomaly raised by the Defendant, that of the possible inaccuracy in the calculations due to the special order delay in Thomasville sales. *See, e.g., Testimony of Steven Pierce* at 89. This issue of timing also brings into question the court's calculations of damages based upon fiscal quarters.

Thus far, the court's calculation of damages has consisted of considering sales figures from the fourth fiscal quarter of 1995 and the first fiscal quarter of 1996. The court is aware that this time period does not reflect the entire damages period as agreed to by the parties. *See Agreed Order*, Adv. Doc. #81–1, at ¶3. As the fourth fiscal quarter commences at the beginning of the month of November, damages for the period of October 17, 1995 to October 31, 1995 are not being calculated.[16] Thus approximately two weeks of damages have apparently been overlooked. This is clearly the source of the adjustments made by Mr. Taub to his calculations of damages. *See, e.g.*, footnote 6, *supra;* Plaintiff's Demonstrative Exhibit 81; Defendant's Exhibit 81.

---

15. The court is aware that these exact same results could have been achieved by performing a shorthand calculation, simply subtracting the expected average rate of growth from the previously calculated changes due to Thomasville.

16. In addition, the remaining four months of the damages period past April are not considered in either Mr. Taub's or the court's calculations. This omission is based upon the shared assumption that as sales of Thomasville products in the second fiscal quarter of 1996 actually increased, no damages were incurred. *See, e.g., Testimony of Julian Taub* at 169, 171–72.

Unlike Mr. Taub, however, the court has made no adjustment to its calculations to account for these two weeks. This appears to be problematic, until viewed in conjunction with Defendant's earlier mentioned objection to sales lag. Mr. Pierce testified that because furniture is a special order business, as opposed to Elder–Beerman's primarily cash-and-carry sales, sales figures for a given period do not accurately reflect actual sales within that period. *See Testimony of Steven Pierce* at 89. Mr. Pierce explained that as furniture sales may take at least two weeks and possibly longer to be actually shipped, and as sales are not recorded on the books until shipped, furniture sales figures for any given period actually reflect somewhat earlier sales. *Id.*

Taken together, the court feels that the lag in the recording of the furniture sales on the books and the calculation of damages beginning with the fourth fiscal quarter substantially cancel one another out. Given the time lag in question, it is highly unlikely that any sales decline in the final two weeks of October of 1995 would be the result of Thomasville's actions. To the extent that this time lag may be greater, it inures to the benefit of the Defendant, as stronger sales in the fourth quarter mean less damages attributable to Thomasville. Thus the court finds merit with Thomasville's objection, but finds that given the time period used for the court's calculations, the calculation of lost profits is reasonably certain in accordance with Ohio law. *See Combs,* 466 N.E.2d at 887.

## LOST ANCILLARY SALES

In addition to Elder–Beerman's claim for lost profits from lost Thomasville sales, Elder–Beerman has also asserted a claim for lost profits from lost ancillary sales.

In order to establish that Elder–Beerman has lost ancillary sales, it is necessary for both causation and damages to be determined in accordance with Ohio law. *See AGF, Inc. v. Great Lakes Heat Treating Co.,* 51 Ohio St.3d 177, 555 N.E.2d 634, 639 (1990); *City of Gahanna v. Eastgate Properties, Inc.,* 36 Ohio St.3d 65, 521 N.E.2d 814, 818 (1988); *Charles R. Combs Trucking, Inc.*

*v. International Harvester Co.,* 12 Ohio St.3d 241, 466 N.E.2d 883, 887 (1984); *Endersby v. Schneppe,* 73 Ohio App.3d 212, 596 N.E.2d 1081, 1084 (1991); *Kinetico, Inc. v. Independent Ohio Nail Co.,* 19 Ohio App.3d 26, 482 N.E.2d 1345, 1350 (1984).

█ Although the issue of lost profits from lost ancillary sales appears to be one of first impression under Ohio law, the court finds that the *Combs* test is such that lost ancillary sales may be compensable if reasonably certain and established from facts in evidence. *See Combs,* 466 N.E.2d at 887; *Endersby,* 596 N.E.2d at 1084; *Kinetico,* 482 N.E.2d at 1350. *Combs* does not specify the nature of the profits that may recovered, so long as they are reasonably certain. *Combs,* 466 N.E.2d at 887. In addition, this issue has been addressed in several jurisdictions permitting lost profit recovery in a manner similar to Ohio, and these courts have consistently held that lost profits from lost ancillary sales are compensable. *See, e.g., AM/PM Franchise Ass'n v. Atlantic Richfield Co.,* 526 Pa. 110, 584 A.2d 915, 923–24 (1990) (concluding that loss of secondary profits, "meaning that the sales of other products suffered as a result of the breach" are compensable); *Lavigne v. J. Hofert Co.,* 431 So.2d 74, 76–77 (La.Ct.App.1983).

█ As in the case of lost Thomasville sales, Elder–Beerman may use a statistical analysis of facts in evidence to show both causation and damages. *See, e.g., Endersby,* 596 N.E.2d at 1084; *Kinetico,* 482 N.E.2d at 1350. In other words, Elder–Beerman may analyze the evidence to show if the loss of Thomasville sales had a "ripple effect" on other sales by a statistical analysis of facts in evidence. *See, e.g., Endersby,* 596 N.E.2d at 1084; *Kinetico,* 482 N.E.2d at 1350; *accord AM/PM Franchise Ass'n,* 584 A.2d at 923–24.

█ In order to meet this burden, Elder–Beerman once again relied on the expert testimony of Mr. Julian Taub. Mr. Taub calculated that for every $100.00 spent on Thomasville furniture, the customer spent an additional $30.90 on other products at Elder–Beerman. *Testimony of Julian Taub* at 173. This dollar amount was arrived at by examin-

ing summaries of items charged by Elder–Beerman customers also purchasing Thomasville furniture. *See id.* at 211; Defendant's Exhibits C & D. From this, Mr. Taub computed a percentage of ancillary sales purchases (30.9%) by dividing the total non-Thomasville purchases by the total Thomasville purchases. *Testimony of Julian Taub* at 213; Defendant's Exhibits C & D.

The court finds that this statistical analysis is exactly what was contemplated by the Ohio courts in *Endersby* and *Kinetico, Endersby,* 596 N.E.2d at 1084; *Kinetico,* 482 N.E.2d at 1350, and is within the range of reasonable certainty required by the Ohio Supreme Court. *Combs,* 466 N.E.2d at 887. The court therefore finds that this methodology is sufficient to demonstrate causation and damages for lost ancillary sales.

Multiplying the above percentage for ancillary sales, 30.9%, by the total amount of lost Thomasville sales, $1,044,347.45, the court calculates that Elder–Beerman has lost a total of $322,703.36 in ancillary sales due to Thomasville's actions. In order to reduce this figure to lost profits, it must be multiplied by the above-calculated net profit margin, 25.5%, resulting in a total lost profit from lost ancillary sales of $82,289.36. The court therefore finds that Elder–Beerman has lost a total of $82,289.36 in profits from ancillary sales lost due to Thomasville's actions.

## LOST PROFITS FROM CREDIT TRANSACTIONS

In addition to Elder–Beerman's claims for lost profits from lost Thomasville sales and lost profits from lost ancillary sales, Elder–Beerman has also asserted a claim for lost profits from lost credit transactions.

As was the case with lost ancillary sales, in order to establish that Elder–Beerman has lost credit transactions, it need only show that the loss of furniture sales, previously found by the court to have been caused by Thomasville, caused a loss in credit transactions. *AGF, Inc. v. Great Lakes Heat Treating Co.,* 51 Ohio St.3d 177, 555 N.E.2d 634, 639 (1990). If Elder–Beerman is capable of showing such a loss, including a showing by a statistical analysis of the evidence, *see, e.g., Endersby v. Schneppe,* 73 Ohio App.3d 212, 596 N.E.2d 1081, 1084 (1991); *Kinetico, Inc. v. Independent Ohio Nail Co.,* 19 Ohio App.3d 26, 482 N.E.2d 1345, 1350 (1984), Elder–Beerman must reduce that showing to a calculation of lost profits that complies with the requirements of Ohio law. *See City of Gahanna v. Eastgate Properties, Inc.,* 36 Ohio St.3d 65, 521 N.E.2d 814, 818 (1988); *Charles R. Combs Trucking, Inc. v. International Harvester Co.,* 12 Ohio St.3d 241, 466 N.E.2d 883, 887 (1984).

In support of its claim for lost profits from lost credit transactions, Elder–Beerman presented the testimony of Timothy Broderick, Elder–Beerman's Vice–President of Credit. *See* Testimony of Timothy Broderick, October 24, 1996, Hearing Transcript pages 223–265 (hereinafter "1 *Testimony of Timothy Broderick* at ——"); Testimony of Timothy Broderick, October 25, 1996, Hearing Transcript pages 182–190 (hereinafter "2 *Testimony of Timothy Broderick* at ——"). Mr. Broderick testified at trial that credit penetration of furniture sales at Elder–Beerman is approximately 74%. 1 *Testimony of Timothy Broderick* at 241. This means that of the total furniture sales at Elder–Beerman, 74% are normally processed through credit transactions. *Id.* at 242.

Based upon this figure, Mr. Broderick testified that it is reasonable to assume that of the lost Thomasville and ancillary furniture sales, 74% of these sales would have been made on credit. *Id.* at 247–48. Substituting the court's calculations for those used at trial, this would mean that of the $1,367,050.81 in lost furniture sales ($1,044,347.45 in lost Thomasville sales and $322,703.36 in lost ancillary sales), 74% of those sales, or $1,011,617.59, would have been credit sales. This dollar amount represents the total value of lost furniture sales stemming from Thomasville's actions.

The court is satisfied that this methodology is sufficient to establish causation under Ohio's law of lost profits damages. *See Combs,* 466 N.E.2d at 887; *see also AGF, Inc.,* 555 N.E.2d at 639; *Schulke Radio Prods., Ltd. v. Midwestern Broad. Co.,* 6

Ohio St.3d 436, 453 N.E.2d 683, 686 (1983); *Rhodes v. Rhodes Indus., Inc.,* 71 Ohio App.3d 797, 595 N.E.2d 441, 448–49 (1991); *Kinetico,* 482 N.E.2d at 1350.

■ Even so, as in the case of lost sales and lost ancillary sales, this figure must be reduced to a calculation of lost profits. *See supra.* Mr. Broderick calculated that for every dollar processed by Elder–Beerman in a credit transaction, the Elder–Beerman's typical finance charge yield would be 15.89%. 1 *Testimony of Timothy Broderick* at 242. This percentage represents the gross profit Elder–Beerman normally realizes on its credit transactions. *Id.* at 243.

■ In order to reduce finance charge yield, or gross profit, to net finance charge yield, or net profit, it is necessary to factor out the expenses Elder–Beerman would have incurred as a result of its financing of these sales. *Id.; see Rhodes,* 595 N.E.2d at 448–49; *see also Schulke,* 453 N.E.2d at 686. In credit parlance, these expenses are known as "cost of funds." *See* 1 *Testimony of Timothy Broderick* at 243.

Mr. Broderick testified that the cost of funds for financing credit transactions at Elder–Beerman is 8%. *Id.* In support of this testimony, Elder–Beerman also presented the testimony of Mr. Perry Schiller, Treasurer of Elder–Beerman. *See* Testimony of Perry Schiller, October 25, 1996, Hearing Transcript pages 11–12 (hereinafter *"Testimony of Perry Schiller* at ——"). Mr. Schiller also testified that the cost of funds for financing credit transactions at Elder–Beerman is 8%. *Testimony of Perry Schiller* at 12.

Both Mr. Broderick and Mr. Schiller testified that in order to determine Elder–Beerman's net profit percentage on credit transactions, it is necessary only to subtract the cost of funds (8%) from the gross yield (15.89%). 1 *Testimony of Timothy Broderick* at 242; *Testimony of Perry Schiller* at 12. The resulting percentage for net yield is therefore 7.89%. 1 *Testimony of Timothy Broderick* at 242.

Finally, in order to calculate Elder–Beerman's lost profits from lost credit transactions, it is necessary only to multiply the net yield (7.89%), by the total value of lost furniture sales that would have been charged to Elder–Beerman's store card, calculated above, $1,011,617.59. The resulting calculation of lost profits from lost credit transactions is therefore $79,816.61.

After having examined Mr. Broderick's methodology and having substituted into that methodology the court's calculations of lost sales, the court is satisfied that the resulting figure for lost profits from lost credit transactions, $79,816.61, satisfies Ohio's requirement that lost profits damages be reasonably certain and calculable from the evidence. *See Eastgate Properties,* 521 N.E.2d at 818; *Combs,* 466 N.E.2d at 887; *Endersby,* 596 N.E.2d at 1084; *Kinetico,* 482 N.E.2d at 1350.

## "CREDIT CARD CARRYING CHARGES"

■ Having found that Elder–Beerman has properly established lost profits from credit transactions connected with Thomasville sales, the court must address the issue raised by Defendant that this element of lost profits should be limited to only those lost profits attributed to credit card sales alone, not those lost profits stemming from other forms of credit transactions.

The dispute at trial turned on the interpretation of the phrase "credit card carrying charges" in the Agreed Order. *See Agreed Order,* Adv.Doc. # 81–1, at ¶ 3. Counsel for Thomasville argued that this phrase should be limited to only those furniture charges made on a credit card. *See* October 24, 1996, Hearing Transcript pages 258. The court, after hearing argument from both parties and the testimony of Mr. Timothy Broderick on the meaning of this phrase, took the matter under advisement. *Id.* at 258–265, *see also* October 25, 1996, Hearing Transcript pages 2–11.

When faced with the issue of interpreting the meaning of language within an agreed order, the court is mindful of the Sixth Circuit's pronouncements in *City of Covington v. Covington Landing Ltd. Partnership,* 71 F.3d 1221, 1227 (6th Cir.1995), where it stated that "[a]n agreed order, like a consent decree, is in the nature of a contract, and the

interpretation of its terms presents a question of contract interpretation." *Id.; see Huguley v. General Motors Corp.*, 67 F.3d 129, 133 (6th Cir.1995) ("A consent decree is a contractual agreement and ... the district court is not free to reform the contract to compensate one party for making a bad bargain."); *see also Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574, 104 S.Ct. 2576, 2585–86, 81 L.Ed.2d 483 (1984). Regarding consent decrees, the Supreme Court has also stated that "scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *United States v. Armour & Co.*, 402 U.S. 673, 681–682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971).

In interpreting the meaning of the phrase "credit card carrying charges," the court examined the evidence presented to the court at the October 24 and 25, 1996 hearing. This examination is consistent with the Sixth Circuit's holding in *Covington*, where the panel upheld the bankruptcy court's consideration of extrinsic evidence to interpret language within an Agreed Order. *Covington*, 71 F.3d at 1225.

It is clear from the testimony before the court that the phrase "credit card carrying charges" means all point-of-sale transactions processed through the Elder–Beerman credit card system. This includes both revolving credit card charges and installment charge sales. Mr. Broderick testified that installment sales are a by-product of the credit card sales. 1 *Testimony of Timothy Broderick* at 251. He testified that a customer wishing to make either a revolving credit card purchase or an installment charge purchase does so by presenting the Elder–Beerman credit card at the time of purchase. 2 *Testimony of Timothy Broderick* at 182. In addition, statements for installment charge purchases are included within the statements for the Elder–Beerman credit card. *Id.* at 183. Finally, Mr. Broderick testified that the majority of furniture sales are installment sales purchases through the credit card system. 1 *Testimony of Timothy Broderick* at 262.

The court finds that it is clear from the extrinsic evidence that the phrase "credit card carrying charges" is used to mean all point-of-sale transactions involving the Elder–Beerman credit card. Just as the trial court is not permitted to reform an agreed order to "to compensate one party for making a bad bargain," neither is the court permitted to interpret an agreed order to provide one party with a greater benefit than the parties intended. *See, e.g., Huguley*, 67 F.3d at 133.

As all of the extrinsic evidence noted above indicates that the parties intended the phrase "credit card carrying charges" to include all credit transactions, Thomasville's proposed narrow reading of this phrase is not sustainable. The court therefore finds that the above calculation of lost profits from all lost credit transactions to be an appropriate component of Elder–Beerman's damages claim.

## ATTORNEYS' FEES

Having found that Elder–Beerman has carried its burden of showing lost profits damages for lost Thomasville sales, lost ancillary sales, and lost credit transactions, the court turns to the issue of attorneys' fees.

Calculation of attorneys' fees is governed by the Agreed Order. *See Agreed Order*, Adv.Doc. # 81–1, at ¶ 12. In accordance with that Order, Elder–Beerman was required to set forth a total claim for damages (the "Damages Amount") at the commencement of the October 24 and 25, 1996 hearing. *Id.* Elder–Beerman did so, stating a claim for damages exclusive of attorneys' fees in the amount of $650,005.00. *See* October 24, 1996, Hearing Transcript pages 7–8.

The terms of the Agreed Order stipulated that if Elder–Beerman were to be awarded the entire Damages Amount, Elder–Beerman would receive $250,000.00 in attorneys' fees. *Agreed Order*, Adv.Doc. # 81–1, at ¶ 12. In the event, however, that the court were to award Elder–Beerman only a portion of the Damages Amount, Elder–Beerman's claim for attorneys' fees would be reduced in the same proportion as the reduction in the Damages Amount. *Id.*

It is the court's calculation the Elder–Beerman has been awarded $428,414.57 in damages by way of the court's findings today. This represents $266,308.60 in lost profits from lost Thomasville sales, $82,289.36 in lost profits from lost ancillary sales, and $79,816.61 in lost profits from lost credit transactions. *See supra.* This award of damages is 65.9% of original Damages Amount, $650,005.00. As such, the court finds that Elder–Beerman is entitled to 65.9% of $250,000.00 in attorneys' fees, or $164,750.00. *See Agreed Order,* Adv.Doc. # 81–1, at ¶ 12.

### CONCLUSION

It is the court's conclusion that Thomasville's actions have resulted in a total loss of profits of $428,414.57. In addition, Elder–Beerman is entitled to $164,750.00 in attorneys' fees as per the Agreed Order. The court therefore awards Elder–Beerman $593,164.57 in civil contempt damages, as per this court's earlier decisions.

A separate judgment order to this effect will be entered by the court contemporaneously with this decision.

It is so ORDERED.